## Hunt v. Hunt.

*Will—Devise—Construction—Description of real estate — Declarations—Evidence.*

1. A testator was the owner of a lot extending from West Main Street to South Street, in Uniontown. On the West Main Street end of the lot he erected a building, two stories high in front and one story in height in the rear, which he occupied with his jewelry business for many years, and was so occupying it at the time of his death. On the South Street end of the lot he erected a three-story brick building, which thereafter was occupied by a tenant, who used the first floor and basement for the storage and sale of green vegetables and provisions, and sublet the second and third floors for residence flats, that property being known as Hagan's Market, No. 9 South Street. The rear ends of the buildings came within nine or ten feet of each other, leaving an area-way between them, which was used in connection with the jewelry store. The two buildings were not in any way connected with each other or used for any common purpose. In his will testator provided as follows: "I give, devise and bequeath to my son, Isaac Hunt, all of the real estate which I own at No. 7 West Main Street," in Uniontown, and after making disposition of his residence property and personal estate, he continued: "All the rest and residue of my property not hereinbefore specifically disposed of, of every kind and description, real, personal or mixed, wheresoever situate, I direct shall be equally divided among my eleven children, or their legal heirs," naming them. Isaac Hunt took possession of the South Street property, as well as the jewelry store, claiming to have taken the whole under the will. In an action of ejectment by the other heirs for the property fronting on South Street, alleged by them to be a part of the testator's residuary estate: *Held*, That the devise of the testator to Isaac Hunt carried with it only the land, and the building erected thereon, extending from West Main Street back to the rear wall of the three-story brick building fronting on South Street, known as No. 9 South Street, and did not include the latter building or the land on which it stood, but that the South Street property constituted a part of the residuary estate of the testator.

2. The intention of a testator is to be determined from the words written in his will. If his wishes with regard to the disposition of his property, as thus expressed, can be applied to the existing condition of that property, the result must be accepted. The question in expounding a will is not what the testator meant, but what is the meaning of his words.

3. In such a case statements made by the testator in his lifetime as indicative of his intentions regarding the property are incompetent and irrelevant.

Ejectment, tried by the court without a jury, in accordance with the provisions of the Act of April 22, 1874, P. L. 109. C. P. Fayette Co., Sept. T., 1919, No. 181.

*A. C. Hagan* and *Umbel, Robinson, McKean & Williams*, for plaintiffs.

*Lee Smith* and *D. W. Henderson*, for defendant.

VAN SWEARINGEN, P. J., Aug. 16, 1921.—The controversy in this case came into court in an action of ejectment for possession of the undivided nine-elevenths of a lot of ground, with the building thereon erected, situate in what formerly was the borough, now the city, of Uniontown. After the case was at issue, the parties, by agreement filed, dispensed with trial by jury, and submitted the decision of the case to the court, in accordance with the provisions of the Act of April 22, 1874, P. L. 109. The case was tried before the court without a jury, and on the pleadings and the evidence offered, and a personal inspection of the premises in company with counsel, we find the material facts to be as follows:

1. William Hunt, widower, died in Uniontown July 12, 1916, after having made his last will and testament, dated Dec. 30, 1909, duly probated after his death, leaving to survive him eleven children, to wit: Benjamin L. Hunt, Mary Frances Beeson, Ellen Hale, Margaret Murray, Sarah Flenniken, Lucy

Hagan, Charlotte Marsteller, Elizabeth Scheick, Eve Evans, Robert W. Hunt and Isaac Hunt.

2. The deceased in his lifetime and at the time of his death was the owner in fee of a lot of ground in Uniontown, a part of which is the subject of the present controversy, fronting approximately 21½ feet on the south side of West Main Street, and extending back, practically the same width, 150 feet to the north side of South Street; bounded on the east by lot of Charles H. Gorley and on the west by lot of the heirs of John Gilmore, deceased. He became the owner of the lot by three separate purchases. By deed of April 1, 1871, Jabez Thorndell conveyed to him that portion of the lot beginning at West Main Street and extending back a distance of 44 feet and 3 inches; by deed of May 24, 1890, E. E. Weniger conveyed to him a narrow strip across the lot of a depth of 1 foot and 9 inches; and by deed of April 2, 1900, E. E. Weniger conveyed to him the remainder of the lot, extending 104 feet to South Street.

3. Soon after his purchase of the front part of the lot, the deceased erected thereon a building, in which he thereafter until the time of his death conducted a jewelry store, the building fronting on West Main Street and extending back a distance of about 30 feet. In 1888 he built an addition to the jewelry store, in the rear, extending the building back 14 feet farther, covering practically all of his first purchase. In 1900, after having secured title to the remainder of the lot through to South Street, he extended the jewelry store back about 35 feet farther, which then covered his first and second and a part of his third purchases. When free mail delivery service went into effect in Uniontown, which was on Oct. 1, 1891, the Hunt jewelry store property was numbered, and ever since has been known as No. 7 West Main Street.

4. Between the Hunt lot and the Gilmore property, for many years, there had been a private alley, running from West Main Street to South Street, along the line dividing the properties and occupying a portion of each. In 1901, by agreement of Hunt and Gilmore, this private alley, from West Main Street back towards South Street for a distance of 77 feet, was closed, each of the parties thereafter occupying the portion of it belonging to him, and from that point on back to South Street that portion of the alley which was on the Gilmore land was closed and thereafter occupied by a building erected on the Gilmore property, but on the Hunt property, from that point on back to South Street, as provided by the agreement, the alley, to a width of at least 3 feet, was to be kept open and unobstructed for the joint use of Hunt and Gilmore, their heirs and assigns, forever, or until such time as they should agree in writing to the contrary.

5. In 1902 the deceased erected a three-story brick building on the South Street end of the lot, fronting on South Street and extending back between the Gorley line and the line of the private alley toward the jewelry store a distance of about 62 feet, which reached within 9 or 10 feet of the rear end of the jewelry store building, leaving a vacant space or area-way of that depth for light and air across the entire lot between the building on the Gorley lot and the building on the Gilmore land, the private alley extending along next to the Gilmore line from South Street to the rear corner of the new building, and there disappearing by steps down into the area-way, it being at that point higher than the area-way. This three-story brick building fronting on South Street was rented by Hunt to Isaac N. Hagan, by written lease under date of Feb. 25, 1903, for a period of ten years, beginning April 1, 1903, together with the privilege of using the alley between it and the

1 D. & C.

Gilmore property, although Hagan had occupied the new building from the time of its completion in the fall of 1902, using the first floor and basement for the storage and sale of green vegetables and provisions, and subletting the second and third floors for residence flats. The building was numbered and thereafter known as Hagan's Market, No. 9 South Street. In a renewal lease of the property by Hunt to Hagan for a term of three years, executed by the parties in March, 1914, the property was designated as "All that three-story brick building fronting on South Street, and adjoining building of Charles H. Gorley on the east and lot of John Gilmore's heirs on the west, and running back to the north line of said building, where it adjoins the remainder of said lot belonging to and now in occupancy of the said William Hunt, lessor, and being No. 9 on said South Street."

6. The area-way mentioned was paved with cement. The first floor level of the three-story brick building fronting on South Street is nearly 3 feet higher than the first floor level of the jewelry store building fronting on West Main Street, the rear of the jewelry store building being but one story high, although the front of the building is two stories in height. When the last improvement and extension of the jewelry store was made, a steel beam was put across the rear of the building at the ceiling of the first story, and when the three-story brick building was erected, a steel beam was put across the rear of that building at the ceiling of the first story. The stories of the two buildings differ in height, and these steel beams are approximately on a level with each other. The basements are excavated under both buildings and under the area-way between them. The rear wall of the three-story brick building, next to the area-way, is a solid wall from the bottom of the basement up to the top of the three-story building, and extends entirely across the lot from the Gorley line to the line of the private alley next to the Gilmore property. There is no door or opening of any kind through the wall as a passageway from one basement to the other, or from one building to the other above the basements, although there are windows in the wall at the different stories for light and air, and the sewer-line runs from the basement under the jewelry store through under the three-story brick building to South Street, both buildings being drained into the same sewer, and the water and gas-lines run through from one basement to the other, the gas meters, one for the jewelry store and the other for the Hagan market, being in the Hagan basement, and the water meter for both buildings being under the jewelry store, all of which were so placed at the time of or prior to the erection of the three-story building. The basement under the area-way is connected with the basement under the jewelry store. There is a door from the first floor of the jewelry store out into the area-way, and there is a covered stairway next to the rear wall of the jewelry store building, leading from the area-way down into the basement.

7. From the time of the completion of the three-story brick building in the fall of 1902, when Isaac N. Hagan took possession of it as a tenant, Hunt never occupied it or used it for any purpose, and never exercised any act of control over it except to receive the rent from Hagan.

8. From 1900, which was before the three-story building was erected, down to the time of Hunt's death, the entire property was carried on the assessment rolls in the office of the county commissioners as one property.

9. In addition to the property mentioned, Hunt, at the time of his death, owned his residence property on Church Street and a lot adjoining it, and two properties on Highland Avenue.

10. In his will the testator provided as follows: "Second. I give, devise and

bequeath to my son, Isaac Hunt, all of the real estate which I own at No. 7 West Main Street, in the Borough of Uniontown, Fayette County, Pennsylvania, adjoining lot of Charles Gorley on the east, and lot of the heirs of John Gilmore, deceased, on the west. Third. I bequeath my entire stock of goods on hand in my jewelry store at the time of my death, together with all furnishings and fixtures therein, as well as all tools, appliances and supplies for carrying on the jewelry business, to my three sons, Isaac Hunt, Robert W. Hunt and Benjamin L. Hunt, in the following proportions, viz.: To Isaac Hunt, sixty per cent. thereof; to Robert W. Hunt, twenty per cent. thereof; to Benjamin L. Hunt, twenty per cent. thereof."

11. After disposing of his residence property, and everything contained therein at the time of his death, in a manner in no way affecting this case, the testator, in the sixth paragraph of his will, said: "All the rest and residue of my property not hereinbefore specifically disposed of, of every kind and description, real, personal or mixed, wheresoever situate, I direct shall be equally divided among my eleven children, or their legal heirs," naming them.

12. One of the children, Robert W. Hunt, died Oct. 12, 1917, unmarried, leaving a will dated Jan. 7, 1910, duly probated after his death, wherein he devised and bequeathed all of his estate, real and personal, to his brother, Isaac Hunt.

13. The present action was instituted on June 30, 1919, against Isaac Hunt, by the other nine children of the testator living at that time, to recover possession of the undivided nine-elevenths of the three-story brick building fronting on South Street, and the land on which it stands, known as No. 9 South Street, it being alleged by the plaintiffs that said property constituted a part of the testator's residuary estate. It was conceded by the plaintiffs that title to the undivided two-elevenths of the property was in Isaac Hunt, who then was in actual possession of the entire property, claiming title to the whole thereof under the second paragraph of his father's will.

14. On June 16, 1921, Isaac Hunt, the original defendant, died, after having made his last will and testament under date of Feb. 8, 1919, duly probated since his death, wherein he provided as follows: "Third. I give, devise and bequeath unto my wife, Emma Hunt, all my real estate for and during her natural life, and at her death I give, devise and bequeath the same unto my niece, Charlotte Marsteller, provided that if my said niece, Charlotte Marsteller, should die before reaching the age of twenty-one (21) years, then I give, devise and bequeath the said real estate as follows, unto my sister, Charlotte Marsteller, one-third (⅓) thereof, and the remaining two-thirds (⅔) thereof to be divided equally amongst my other brothers and sisters, share and share alike, the children of a deceased brother or sister to take their parent's share. Fourth. For the purposes named in this will, I appoint William W. Marsteller guardian of my niece, Charlotte Marsteller, in case my wife, Emma Hunt, shall die before my niece, said Charlotte Marsteller, arrives at the age of twenty-one (21) years."

15. Thereafter Emma Hunt, the widow of Isaac Hunt, and his niece, Charlotte Marsteller, whose guardian is William W. Marsteller, by agreement of counsel were substituted as defendants in the action.

The only question in the case is as to the proper construction of that clause of the will of William Hunt which provides: "I give, devise and bequeath to my son, Isaac Hunt, all of the real estate which I own at No. 7 West Main Street, in the Borough of Uniontown, Fayette County, Pennsylvania, adjoining lot of Charles Gorley on the east, and lot of the heirs of John Gilmore,

1 D. & C.

deceased, on the west." Isaac Hunt in his lifetime claimed to have taken title thereunder to the whole of the property running through from West Main Street to South Street, the plaintiffs contending that he took thereunder only the jewelry store property, leaving the remainder of the property fronting on South Street as a part of the testator's residuary estate.

It seems to us that the case is ruled by Myers v. Myers, 16 Pa. Superior Ct. 511. The testator there acquired title to an unimproved lot, extending through from North Queen Street to Market Street, in the City of Lancaster. He built a two-story dwelling-house fronting on North Queen Street, and upon the Market Street end of the lot he erected a two-story brick building to be used as a carpenter-shop. Upon the completion of the buildings, he occupied the dwelling as his residence and used the carpenter-shop as his place of business. The dwelling-house was numbered and known as No. 612 North Queen Street. After having used the building fronting on Market Street as a carpenter-shop for about eighteen months, the deceased remodeled that building, put in partitions and changed it into a dwelling-house, which was numbered and thereafter known as No. 611 North Market Street, and was rented to and occupied by tenants. Shortly after the North Market Street building was remodeled, the decedent caused a substantial board fence to be constructed across the lot and the lot used in connection with the building fronting on North Queen Street, testator's residence, thus was separated from that used in connection with the tenement-house, No. 611 North Market Street. There was no gate or opening through from one lot to the other. The two houses, with the lots respectively appurtenant, continued to be used in this manner until the owner died. The will of the testator was in these words: "I today will and bequeath unto my wife, Alvildia Myers, the property located on North Queen Street, in the City of Lancaster, Lancaster Co., Pa., numbered 612 North Queen Street, and also all the personal property contained therein, and the rest of my real and personal estate to be disposed of as the law directs."

It was held by the lower court, in an action of ejectment against Alvildia Myers for possession of the property at No. 611 North Market Street, that only the property at No. 612 North Queen Street passed to her under the will, which decision, on appeal to the Superior Court, was affirmed. Judge Porter, of the Superior Court, in disposing of the case, after stating that there could be no question that oral evidence was admissible to identify the subject-matter of the devise, and that for that purpose it was competent to show what land had been included in the curtilage of the house at No. 612 North Queen Street, and what monuments had been established upon the ground by the decedent in his lifetime, said: "The intention of the testator is to be determined from the words written in the will. If his wishes with regard to the disposition of his property, as thus expressed, can be applied to the existing condition of that property, the result must be accepted. It is not competent to show by declarations of the testator, made at the execution of his will or subsequently, that he intended a devise to include something that is excluded by the terms of the will as executed. When the subject-matter of this devise came to be ascertained, there was, under the existing conditions of the testator's property and the boundaries marked upon the ground, no doubt or uncertainty calling for explanatory proof. The offer of the defendant to prove what the testator said at the execution of the will was properly excluded."

If it be urged that the words "and also all the personal property contained therein," used in connection with the devise, helped to identify the property

Hunt v. Hunt.

in the Myers case, it may be noted in the present case that immediately following the devise of his real estate "at No. 7 West Main Street," which was the jewelry store property, came the bequest of the testator of his entire stock of goods on hand in his jewelry store at the time of his death, together with all furnishings and fixtures therein, as well as all tools, appliances and supplies for carrying on the jewelry business.

Substituting a solid brick wall, extending all the way across the lot and from the bottom of the basement to the top of the three-story building fronting on South Street, in this case, for the "substantial board fence" in the Myers case, the two cases cannot be distinguished in principle. It is true that in the present case the same sewer and the same water and gas-lines serve both buildings, but they were put there seven years before the testator made his will; and those facts, together with the fact that the entire lot and all the buildings thereon had been carried along as one property on the assessment rolls in the office of the county commissioners from as early as 1900, are not sufficient to overcome the other and more important facts in the case. The testator owned the entire property, and the mere fact that he permitted it to be assessed as one property, and that he permitted the same sewer and the same water and gas-lines to serve both buildings, did not change the character of the uses to which for his own purposes he had devoted it.

The two buildings were as separate, physically, as though they had been situate in different blocks of the city. They were separate and distinct in the uses to which they were put. Jewelry was sold on the main floor of one of them, and green vegetables and provisions were handled on the principal floor of the other. There was nothing to associate them together even in common thought, one of them being known as Hunt's jewelry store, No. 7 West Main Street, and the other as Hagan's Market, No. 9 South Street. The testator, for the fourteen years after the three-story brick building fronting on South Street was erected until the time of his death, exercised no act of control over the building except to receive the rent from the tenant. There was no way of reaching that building except from South Street. The area-way between the two buildings was connected with the jewelry store, but not with the South Street building. The first floor level of the South Street building was nearly 3 feet higher than the first floor level of the jewelry store. The rear of the West Main Street store was but one story in height, while the rear of the South Street property ran up three stories. To a person standing in the area-way between the two buildings, the South Street property presented a blank wall all the way to the top, except for windows for light and air. Into the West Main Street property from the area-way there was a door at floor level, and from the area-way leading down into the basement of that building there was an outside covered stairway.

As was said in Myers v. Myers, 16 Pa. Superior Ct. 511: "The intention of a testator is to be determined from the words written in his will. If his wishes with regard to the disposition of his property, as thus expressed, can be applied to the existing condition of that property, the result must be accepted." The words of the will here are, "the real estate which I own at No. 7 West Main Street." The words of the will there were, "the property located on North Queen Street numbered 612 North Queen Street." The words of the will can be applied to the existing conditions of the property here as easily as they could be applied to the existing conditions of the property there. The testator was the absolute owner of the property, and he had a right to improve it and divide it as he pleased. He built the two separate buildings

1 D. & C.

Hunt v. Hunt.

on the lot, one fronting on West Main Street and the other fronting on South Street, and devoted them to entirely different uses, which continued for years until the time of his death. He had a right to divide the property in his will, and by the terms of his will he clearly did so. "The question in expounding a will is not what the testator meant, but what is the meaning of his words:" Hancock's Appeal, 112 Pa. 532; Glenn v. Stewart, 265 Pa. 208; O'Neill's Estate, 266 Pa. 9; Ludwick's Estate, 269 Pa. 365.

Our conclusions of law are:

1. That the testimony in the case as to statements made by the testator, William Hunt, in his lifetime, as indicative of his intentions regarding the property, was incompetent and irrelevant.

2. That the devise of the testator, William Hunt, to his son, Isaac Hunt, of "all of the real estate which I own at No. 7 West Main Street, in the Borough of Uniontown, Fayette County, Pennsylvania, adjoining lot of Charles Gorley on the east and lot of the heirs of John Gilmore, deceased, on the west," carried with it only the land and the building erected thereon, extending from West Main Street back to the rear wall of the three-story brick building fronting on South Street, known as No. 9 South Street, and did not include the latter building or the land on which it stands.

3. That the three-story brick building fronting on South Street, known as No. 9 South Street, and the land on which it stands, constituted a part of the residuary estate of the testator, William Hunt.

4. That the plaintiffs are entitled to judgment in their favor for possession of the undivided nine-elevenths of the premises described in the writ.

And now, Aug. 16, 1921, for the reasons stated in the opinion herewith filed, it is ordered and decreed, nisi, that judgment be entered in favor of the plaintiffs and against the defendants for possession of the undivided nine-elevenths of the premises described in the writ.

From Luke H. Frasher, Uniontown, Pa.

NOTE.—No exceptions were filed and the nisi decree was made absolute.